## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

KAREN ANN DOLECKI,

                                 CASE NO. 2:22-cv-11685

       *Plaintiff,*          District Matthew F. Leitman

*v.*                      Magistrate Judge Patricia T. Morris

COMMISSIONER OF SOCIAL SECURITY,

       *Defendant.*

_____/

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 15, 17)

## I.    RECOMMENDATION

Considering the entire record in this case, I suggest that substantial evidence supports the Commissioner of Social Security's determination that Plaintiff, Karen Dolecki, is not disabled. Accordingly, I recommend that the Court **DENY** Plaintiff's motion for summary judgment, (ECF No. 15), **GRANT** the Commissioner's motion, (ECF No. 17), and affirm the decision.

## II.    REPORT

### A.    Introduction and Procedural History

Dolecki protectively applied for disability insurance benefits ("DIB") on January 20, 2020, alleging that she became disabled on June 27, 2018. (ECF No. 10-5, PageID.308, 315). The Social Security Administration denied her claims on

1

June 11, 2020, and they were denied again upon reconsideration.  (*Id.* at PageID.116, 134, 156, 183; ECF No. 10-4, PageID.218, 226, 233–34, 241).  Dolecki requested a hearing before an Administrative Law Judge ("ALJ") which was held on June 9, 2021.  (ECF No. 10-2, PageID.92–114; ECF No. 10-4, PageID.248–49).  The ALJ issued a decision on June 22, 2021, finding that Dolecki was not disabled within the meaning of the Social Security Act.  (ECF No. 10-2, PageID.69–84).  The Appeals Council denied review on June 7, 2022.  (*Id.* at PageID.53).

On July 22, 2022, Dolecki filed a complaint seeking judicial review of the ALJ's final decision.  (ECF No. 1).  This case was referred to the undersigned, and both parties later filed cross-motions for summary judgment.  (ECF Nos. 15, 17).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g) (2018).  The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation

marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.     Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of
> any medically determinable physical or mental impairment
> which can be expected to result in death or which has lasted
> or can be expected to last for a continuous period of not less
> than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A) (2018). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any.
> If you are doing substantial gainful activity, we will find

that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s).  If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work.  If you can make an adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2022); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).  The claimant must provide evidence establishing the residual functional capacity, which "is the most

[the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2022).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g) (2022)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Dolecki was not disabled. (ECF No. 9-2, PageID.84). At step one, the ALJ found that Dolecki had not engaged in substantial gainful activity since June 27, 2018. (*Id.* at PageID.72). At step two, the ALJ concluded that Dolecki had the following severe impairments:

> Barrett's esophagus status post radiofrequency ablations, gastroesophageal reflux disease (GERD), degenerative disc disease of the lumbar spine, moderate dextroconvex lumbar scoliosis, mild to moderate thoracolumbar scoliosis, disc herniation at the T6-T7 level, mild medial and patellofemoral compartmental osteoarthritis of both knees, mild degenerative changes of the bilateral hip joints, osteoporosis, post-traumatic stress disorder (PTSD), major depressive disorder, and anxiety

(*Id.*) The ALJ found that Dolecki's osteopenia and right ankle conditions were

5

nonsevere.  (*Id.*)  At step three, the ALJ decided that none of Dolecki's severe

impairments met or medically equaled a listed impairment.  (*Id.* at PageIID.72–76).

Next, the ALJ determined that Dolecki had a residual functional capacity to perform

light work with the following limitations:

> The claimant can frequently climb ramps or stairs but can never climb
> ladders, ropes, or scaffolds. She can occasionally balance, stoop, kneel,
> crouch, or crawl. The claimant must avoid all hazards such as
> dangerous machinery and unprotected heights. The claimant is limited
> to simple and routine work that can be mastered within thirty days or
> by short demonstration. She is limited to simple work-related decisions.
> She can work in an environment with only occasional changes in the
> work setting or routine, and self-paced work only, that is not production
> rate work such as on an assembly line or conveyor belt. The claimant is
> limited to occasional interaction with the public, coworkers, and
> supervisors.

(*Id.* at PageID.76–77).  At step four, the ALJ found that Dolecki could not perform

her past relevant work, and at step five, the ALJ found that there were no jobs in the

national economy, existing in significant numbers, that Dolecki could perform.  (*Id.*

at PageID.82–83).

## E. Background

### 1. Medical Evidence

Karen Dolecki alleges that she cannot work due to a combination of

impairments affecting her spine and mental health—specifically: PTSD, anxiety,

depression, herniated discs, spondylolisthesis, osteopenia, osteoporosis, and

herniated discs.  (ECF No. 10-2, PageID.77; ECF No. 10-6, PageID.346).

6

One of Dolecki's primary care providers, Dr. Christine Sheeler, prepared a statement about Dolecki's functional abilities. She believed Dolecki must be able to freely alternate between sitting and standing, but that Dolecki could never sit nor stand for thirty minutes continuously. (ECF No. 10-7, PageID.882–83). She also opined that Dolecki could neither sit nor stand for more than two hours each in an eight hour workday. (*Id.* at PageID.883). Further, she stated that Dolecki could lift up to ten pounds occasionally, but that she could never lift twenty pounds. (*Id.*) Finally, Dr. Sheeler opined that Dolecki could never twist, stoop, crouch, climb ladders, or climb stairs. (*Id.* at PageID.884).

Once per month, Dolecki visited the Judson Center where she received treatment for her depression and anxiety. (*Id.* at PageID.747–804, 936–74, 979–1002; ECF No. 10-10, pageID.1620–71). There, she conducted therapy sessions with Andrea Kiliker and received medication management from Ms. Gwendolyn Marshall, a nurse practitioner. (*Id.*) Ms. Marshall completed a form in which she opined on Dolecki's mental functioning. Specifically, she opined would miss more than four days of work per year and be off task for more than a quarter of the workday because of her depression and anxiety. (ECF No. 10-7, PageID.975–76, 978). Further, Dolecki could not satisfactorily make even "simple work-related decisions," perform work "at a consistent pace without an unreasonable number and length of rest periods," or "deal with normal stress." (*Id.* at PageID.977).

## 2.  The Administrative Hearing

During the Administrative Hearing before the ALJ,  Dolecki testified that she could not work because of her pain and mental health issues.  (*Id.* at PageID.97, 98, 102).  She explained that because of a herniated disc and a condition called "neuro-complex regional pain syndrome," she experienced pain "all over," but particularly in the middle of her back.  (*Id.* at PageID.98).  She took medication to manage her pain, which helped "to a certain extent."  (*Id.*)  However, her pain medications, in addition to her antidepressants, caused her to feel "sleepy and dizzy . . . most of the time."  (*Id.* at PageID.98–99).

Apart from taking medication, Dolecki managed her pain by laying on her side throughout most of the day.  (*Id.* at PageID.101).  Indeed, Dolecki explained that she lay in this position so often that she developed a sore on her left side and elbow.  (*Id.* at PageID.102).  She would get "shooting pains" in her back if she sat up for more than a "couple minutes," and she could stand for no more than ten minutes at a time.  (*Id.* at PageID.105–06).

Dolecki testified that she lived with her brother who paid their bills and maintained the home.  (*Id.* at PageID.97–98).  Because Dolecki spent most of her days in bed, her brother cooked, did laundry, and performed all other household chores.  (*Id.* at PageID.106–07).  Although Dolecki could drive, her brother drove

her most places as sitting "in the driver's seat" caused pain in her lower and middle back. (*Id.* at PageID.98).

As to her mental health, Dolecki testified that she suffered from depression and anxiety. (*Id.* at PageID.102). She explained that these conditions negatively impacted her concentration. (*Id.*) For example, she shared that it took her "forever" to prepare her application for benefits. (*Id.*) However, she also testified that she could garner enough attention to watch television for most of the day, record journal entries, and talk with her daughter on the phone. (*Id.* at PageID.102, 104–05, 108). She also explained that she took several medications for her depression and anxiety which worked, but were "not as helpful as" she hoped "they would" have been. (*Id.* at PageID.99).

### 3.    The Vocational Expert's Testimony

The ALJ then questioned the Vocational Expert ("VE"). (*Id.* at PageID.111). The ALJ asked the VE to assume a hypothetical person who could "work at the light exertional level" and to further assume:

> That they can never climb ladders, ropes, or scaffolds. They can frequently climb stairs or ramps. They may only occasionally balance, stoop, kneel, crouch, or crawl. And they must avoid all hazards, such as dangerous machinery and unprotected heights. Additionally, this individual is limited to simple and routine work that can be mastered within [thirty] days or by short demonstration, making simple, work related decisions, and to keep a static environment, meaning nor more than only occasional changes in the work setting or routine. And they are required to keep self-paced work as opposed to production work rate, like on an assembly line or a conveyor belt. And they can have

9

reduced contact, occasional contact, with the public, coworkers, and supervisors.

(*Id.* at PageID.111–12).   The VE testified that an individual with these limitations could not perform Dolecki's past relevant work.   (*Id.* at PageID.112).   However, that individual could work as a router, light work, approximately 40,000 jobs, Dictionary of Occupational Titles ("DOT") code 222.587-038; a ticketer, light work, 56,000 jobs, DOT code 229.587-018; and a garment sorter, light work, 22,000 jobs, DOT code 222.687-014.   (*Id.*)

The VE then testified that most employers would not tolerate an employee being off task for more than ten percent of the workday, excluding normal breaks. (*Id.*)   The VE then explained her testimony was generally consistent with the DOT, except that the DOT did not address climbing, "jobs with few changes and decisions," and "the off task rate."   (*Id.* at PageID.113).   To testify as to these limitations, the VE relied on her training and "experience rather than the DOT.   (*Id.*)

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision.   42 U.S.C. § 423(d)(5)(B) (2018).   The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed Psychologist, which includes:

    (i)    A licensed or certified psychologist at the independent practice level; or

    (ii)    A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

11

(8) Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a) (2021).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.* § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The Social Security Administration ("SSA") "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.* § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when

12

it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.* § 404.1520c(c)(3). This factor will include the analysis of:

(i) Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii) Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii) Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the

level of knowledge the medical source has of your
impairment(s);

(iv)    Extent of the treatment relationship. The kinds and extent of
examinations and testing the medical source has performed or
ordered from specialists or independent laboratories may help
demonstrate the level of knowledge the medical source has of
your impairment(s);

(v)     Examining relationship. A medical source may have a better
understanding of your impairment(s) if he or she examines you
than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this

determination, the SSA will consider "[t]he medical opinion or prior administrative

medical finding of a medical source who has received advanced education and

training to become a specialist may be more persuasive about medical issues related

to his or her area of specialty than the medical opinion or prior administrative

medical finding of a medical source who is not a specialist in the relevant area of

specialty." *Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other

factors that "tend to support or contradict a medical opinion or prior administrative

medical finding." *Id.* § 404.1520c(c)(5). "This includes, but is not limited to,

evidence showing a medical source has familiarity with the other evidence in the

claim or an understanding of our disability program's policies and evidentiary

requirements." *Id.* Further, when the SSA considers "a medical source's familiarity

with the other evidence in a claim, we will also consider whether new evidence we

14

receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.* § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important

factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2).   As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision.   We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or

decision, even under § 404.1520c." *Id.* § 404.1520b(c).  The regulations categorize

evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other

governmental and nongovernmental entities;" "[d]isability examiner findings,"

meaning, "[f]indings made by a State agency disability examiner made at a previous

level of adjudication about a medical issue, vocational issue, or the ultimate issue

about whether you are disabled;" and "[s]tatements on issues reserved to the

Commissioner[;]" these statements include:

(i)     Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

(ii)    Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

(iii)   Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

(iv)    Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)     Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)    Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.* § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other

governmental and nongovernmental entity about whether you are disabled, blind,

employable, or entitled to any benefits is based on its rules, it is not binding on us

17

and is not our decision about whether you are disabled or blind under our rules." *Id.* § 404.1504.   Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.*   The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f).   Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.*   Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* § 404.1502(g).   Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies

18

(such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain. "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.* § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.* § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.* § 404.1529(a).  The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." *Id.* § 404.1529(c)(3).  This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the

20

objective medical evidence and other evidence, will be taken into account . . . .  We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]"  *Id.*  The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

    (i)     [D]aily activities;

    (ii)    The location, duration, frequency, and intensity of . . . pain;

    (iii)   Precipitating and aggravating factors;

    (iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

    (v)    Treatment, other than medication, . . . received for relief of . . . pain;

    (vi)   Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work."  *Id.* § 404.1530(a).  Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits."  *Id.* § 404.1530(b).  Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)     The specific medical treatment is contrary to the established teaching and tenets of your religion;

(2)     The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)     Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)     The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)     The treatment involves amputation of an extremity, or major part of an extremity.

*Id.* § 404.1530(c).

### G. Arguments and Analysis

Dolecki argues that the ALJ erred at step five because she did not present the vocational expert with an RFC that accurately reflected her functional abilities. *See Varley v. Sec'y of Health & Hum. Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). She explains that the ALJ found an under-restrictive RFC by erroneously discounting medical opinions from two of her medical providers, Dr. Sheeler and nurse practitioner Marshall.

Specifically, Dolecki argues that the ALJ contravened the regulations by neglecting to articulate how she considered the "supportability" of both opinions, and that the Court must remand for the ALJ to explain how the supportability of both

22

opinions factored into her treatment of their findings.  In the alternative, she argues that the ALJ did not rely on substantial evidence in rejecting the opinions, even if she articulated how she considered their supportability.  For the following reasons, I suggest that both arguments fail.

### 1. Whether the ALJ Discussed the Supportability of Dr. Sheeler and Ms. Marshall's Medical Opinions.

To start, the ALJ adequately articulated the basis for her finding and complied with the procedural requirements outlined in 20 C.F.R. §§ 404.1520c, 416.920c.  As discussed above, an ALJ must consider all medical opinions and explain how persuasive he or she found the opinions of each medical source.  20 C.F.R. §§ 404.1520c(a)–(b)(1); 416.920c(a)–(b)(1).  An ALJ may not "defer or give any specific evidentiary weight, including controlling weight" to any medical source— it is the ALJ's responsibility to freely weigh each medical opinion.  *Id.*  When considering the persuasiveness of a medical opinion, an ALJ must consider (1) how well the opinion is supported by objective evidence and the medical source's explanations, (2) the opinion's consistency with the entire record, (3) the source's "[r]elationship with the claimant," (4) the specialization of the medical source, and (5) any other factor that may "support or contradict" the medical opinion.  *Id.* §§ 404.1520c(c); 416.920c(c).

The regulations explain that "supportability" and "consistency" are the most

important of these factors. *Id.* §§ 404.1520c(b)(2), 416.920c(c). Accordingly, an ALJ need only discuss these two factors in his or her decision. *Id.* The ALJ's discussion must be detailed enough to allow a reviewing court "to determine whether" the ALJ's decision "was supported by substantial evidence." *Hardy v. Comm'r of Soc. Sec.*, No. 20-10918, 2021 WL 3702170, at *4 (E.D. Mich. Aug. 13, 2021) (quotation marks omitted) (quoting *Vaughn v. Comm'r of Soc. Sec.*, No. 20-1119, 2021 WL 3056108, at *11 (W.D. Tenn. July 20, 2021)).

The ALJ found Dr. Sheeler's opinions unpersuasive because they were "not supported by the treatment records." (ECF No. 10-2, PageID.80). She explained that notwithstanding Dr. Sheeler's lengthy treatment history with Dolecki, there was "nothing in the medical record" that would "support" her "extreme limitations." (*Id.*) In support, the ALJ cited a nonexhaustive list of medical records that she believed illustrated Dolecki's "routinely . . . unremarkable neurologic, gait, and abdominal findings." (*Id.*) Some of these citations referred to Dolecki's own treatment notes, while others referred to medical records from other sources. (*Id.*) The ALJ addressed Ms. Marshall's opinions in a similar manner. (*Id.* at PageID.81–82). As with Dr. Scheeler's opinions, the ALJ found Ms. Marshall's opinions unpersuasive because they conflicted with the source's own treatment notes and records from other sources. (*Id.*)

In neither discussion, however, did the ALJ evaluate the objective medical

evidence or explanations the medical source statements explicitly held out in support of their opinions.  She assessed both statements exclusively by comparing them to Dolecki's treatment notes.

According to Dolecki, that addressed only the consistency of the opinions, not their supportability.  To evaluate an opinions "consistency," the regulations explain that ALJ's should determine how "consistent" the opinion is "with the evidence from other medical sources and nonmedical sources in the claim . . . ."  20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).  Supportability, by contrast, evaluates an opinion's internal support: "[t]he more relevant the objective medical evidence and supporting explanations *presented by* a medical source are to support his or her" opinion, "the more persuasive the" opinion "will be."  *Id.* §§ 404.1520c(c)(1), 416.920c(c)(1) (emphasis added).  Because the ALJ did not discuss the supportability of these opinions, Dolecki argues that the Court must remand so the ALJ can articulate how she considered this factor.  (ECF No. 15-1, PageID.1716–18, 1727).

Dolecki reads the regulations to mean that supportability only encompasses the evidence and explanations a source "[holds] out" to justify his or her opinions. (*Id.* at PageID.1717).  In other words, only the medical findings cited in the medical source statement itself are "presented" in support of the opinion; any other findings are not relevant to the opinion's "supportability"—even if they came from the same source and even if they informed that source's opinions.  (*Id.*); *see also* 20 C.F.R. §§

404.1520c(c)(1), 416.920c(c)(1).  Yet, as Dolecki points out, the ALJ did not discuss the evidence or explanations that either source "held out" in support of their opinions.  Her evaluation of the opinions simply noted that both sources' conclusions conflicted with their own treatment notes which they did not cite in their medical source statements. (ECF No. 10-2, PageID.80–82).  Thus, the issue here is whether the ALJ's observation that the medical sources' opinions conflicted with their own treatment notes went to the opinions' supportability or to some other factor.  For three reasons, I suggest that this observation fell under the supportability factor.

First, adopting Dolecki's narrow view of the regulations would cut against the purpose of the supportability factor.  The Administration assesses an opinion's "supportability" to evaluate the rationale behind the medical source's conclusions. *See* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1); *see also Vellone ex rel. Vellone v. Saul*, No. 1:20-cv-00261, 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021).  And no doubt, a treating source relies on all his or her observations of the claimant when writing an opinion on the claimant's functional abilities, even if those observations are not explicitly referenced.  *See McMillen v. Comm'r of Soc. Sec.*, No. 1:20-cv-2531, 2022 WL 1215495, at *11–12 (N.D. Ohio Mar. 11, 2022); *Murray v. Comm'r of Soc. Sec.*, No. 2:21-cv-2078, 2021 WL 6063289, at *4 (S.D. Ohio Dec. 22, 2021).  Thus, an ALJ who discusses the inconsistency between a treating source's prior findings and the source's opinion is not simply pointing out contradictory evidence;

26

the ALJ is instead speaking to the rationale behind the opinion. *See Murray*, 2021 WL 6063289, at \*4. To Dolecki, the "supportability" factor examines a source's supporting evidence, but only if that evidence is explicitly references alongside the opinion. (ECF No. 15-1, PageID.1717). Surely, the Administration did not intend to draw such an arbitrary line.

With that in mind, the regulation's statement that supportability examines evidence and explanations "presented . . . to support" the opinion appears to reflect an assumption that typically, the Administration need not (or cannot) look further than the medical source statement to ascertain the source's rationale. 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). Indeed, that may often be true when ALJs receive opinions from non-treating sources. And notably, the regulations do not specify *where* a source must "present" its evidence and explanations, nor do they define "support" to include only that evidence which corroborates the source's conclusion on the claimant's functional abilities. *Id.*

Second, discounting a treating source's opinion because it conflicts with the source's own treatment records is functionally no different than discounting a conclusory opinion for lacking sufficient evidence. By pointing to a treating source's conflicting notes, an ALJ is not merely pointing out a conflict between the notes and the source's opinions. Rather, the ALJ is demonstrating how the source's cited evidence (if any) was inadequate for the source to reach his or her conclusion when

27

taken in context with the rest of the source's findings.  *Cf. Thomas M. v. Kijakazi*, No. 1:20-cv-03167, 2022 WL 1843974, at *8 (E.D. Wash. Mar. 17, 2022); *Jidas v. Comm'r of Soc. Sec.*, No. 17-14198, 2019 WL 2252289, at *6 (E.D. Mich. Feb.26, 2019).  In essence, the ALJ is demonstrating that the source did not fully explain how it assessed its own findings when forming an opinion on the claimant's abilities.  That speaks to supportability, not consistency.  See *McMillen*, 2022 WL 1215495, at *11–12.

And third, Dolecki's narrow reading of the supportability factor leads to peculiar results when read in context with the rest of the regulation.  Dolecki argues that the ALJ's evaluation of the sources' conflicting treatment notes fell under the consistency factor.  Yet the regulations explain that the consistency factor only applies to "evidence from *other* medical sources."  20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2) (emphasis added).  So if conflicting treatment notes do not relate to supportability, then they can only come in under the catch-all provision in §§ 404.1520c(c)(5), 416.920c(c)(5).  But ALJs are not required to articulate their consideration of the catch-all provision.  *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2).  Thus, under Dolecki's interpretation, ALJs would be required to discuss an opinion's consistency with findings from other sources, but excused from discussing the opinion's consistency with evidence from the same source.  It seems unlikely that the Administration would have intended this result.  *See Takacs v. Kijakazi*, No. 1:20-

CV-02120, 2022 WL 447700, at *9 n.8 (N.D. Ohio Jan. 26, 2022); *Alexander v. Kijakazi*, No. 1:20-cv-01549, 2021 WL 4459700, at *12 (N.D. Ohio Sept. 29, 2021). And not only would tossing conflicting treatment notes under the catch-all provision reflect odd policy decisions, but the examples provided in the catch-all provision bear little resemblance to this type of evidence, which suggests that the Administration did not intend for treatment notes to fall under this category. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

Accordingly, the ALJ articulated her consideration of both opinions' supportability by discussing the sources' conflicting treatment notes.[1]

In the alternative, Dolecki argues that the ALJ's discussion—insofar as it addressed Dr. Sheeler's opinions—was inadequate for another reason. Dolecki argues that the ALJ did not "articulate" her consideration of the supportability and consistency factors in enough detail to allow meaningful review because her only "explanation" consisted of a string citation to a collection of records that purportedly undermined Dr. Sheeler's opinions. (ECF No. 20, PageID.1764).

This argument fails on a few levels. First, the Court should consider the

---

[1] Although not directly confronted with this issue, numerous courts have recognized that consideration of a medical source's treatment notes relates to the supportability of that source's opinions. *See, e.g.*, *Jamie W. v. Comm'r of Soc. Sec.*, No. C22-5668-MLP, 2023 WL 2859547, at *4 (W.D. Wash. Apr. 10, 2023); *McMillen*, 2022 WL 1215495, at *11–12; *Blea v. Kijakazi*, No. 1:21-cv-00971, 2022 WL 2974692, at *5 (E.D. Cal. July 27, 2022); *Lavette M. v. Comm'r of Soc. Sec.*, No. 1:21-CV-0058, 2022 WL 17247243, at *6 (W.D.N.Y. Nov. 28, 2022); *Murray*, 2021 WL 6063289, at *4.

argument waived as Dolecki did not raise this issue until she submitted her reply brief. *Palazzo v. Harvey*, 380 F. Supp. 3d 723, 730 (M.D. Tenn. 2019); *Sundberg v. Keller Ladder*, 189 F. Supp. 2d 671, 682–83 (E.D. Mich. 2002) (citing U*nited States v. Perkins*, 994 F.2d 1184, 1191 (6th Cir. 1993)).  Indeed, Dolecki's principal brief actually concedes that "the ALJ articulated consideration of the 'consistency' of Dr. Sheeler's opinion . . . ."  (ECF No. 15-1, PageID.1717).  It merely argues that this discussion was not supported by substantial evidence.  (*Id.* at PageID.1716, 1718–24).  The only procedural error alleged in her principal brief is the ALJ's purported failure to articulate how she considered the supportability of Dr. Sheeler's opinions.  (*Id.* at PageID.1716–17).

Setting aside its untimeliness, Dolecki's argument still fails on its merits.  Most fundamentally, Dolecki is simply incorrect that the ALJ discounted Dr. Sheeler's opinions in a "conclusory" fashion.  The ALJ explained that there was "nothing in the medical record that would support" Dr. Sheeler's "extreme limitations."  (ECF No. 10-2, PageID.80).  Put differently, the ALJ acknowledged Dolecki's impairments and abnormal findings, but disagreed that those findings translated to the severe functional limitations suggested by Dr. Sheeler.  (*Id.*; *see also id.* at PageID.78 (acknowledging Dolecki's "longstanding history of back pain" and "abnormal findings").  *See generally Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these

treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion."); *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391–92 (6th Cir. 1999) (explaining that the claimant has the burden of proving his or her RFC).

Yet the ALJ did not end her discussion there, she explained that not only did she fail to see how Dolecki's abnormal findings translated to the "extreme limitations" outlined in Dr. Sheeler's statement, but that those limitations were belied by other evidence in the record.  Specifically, the ALJ explained that "clinical examinations routinely yielded unremarkable neurologic, gait, and abdominal findings." (ECF No. 10-2, PageID.80).  In support, the ALJ immediately cited an illustrative string citation of medical records, and she cross referenced earlier portions of her decision where she discussed the basis for these findings in more detail. (*Id.* at PageID.78–79).  To be sure, Dolecki takes issue with the ALJ's reliance on those findings, but her criticisms center around whether the ALJ relied on substantial evidence, not whether she articulated her rationale. (*See* ECF No. 15-1, PageID.1718–24).  Even if the Court disagrees with the ALJ's conclusions, and even if those conclusions were not supported by substantial evidence, the ALJ articulated her rationale in enough detail for the Court to at least understand how she reached her conclusion.  Dolecki cannot circumvent the lenient substantial evidence standard by disguising factual disputes as procedural errors.

31

But suppose the ALJ had rejected Dr. Sheeler's opinion in a conclusory fashion. Say, for instance, she merely stated that she did not find Dr. Sheeler's opinions to be persuasive and then provided a string citation of purportedly supportive records, unadorned by any explanation. Relying on *Mason v. Comm'r of Soc. Sec.*, Dolecki argues that this would not constitute proper "articulation" under 20 C.F.R. §§ 404.1520c(b)(2); 416.920c(b)(2). No. 22-cv-10012, 2023 WL 2480734, (E.D. Mich. Mar. 13, 2023). In *Mason*, an ALJ rejected a medical source's opinion that a claimant had significant cognitive deficits. *Id.* at *4. Rather than explain his rationale, the ALJ cited a string of medical records he believed contradicted the opinion. *Id.* However, the Court found that these records were irrelevant to the medical source's opinion. *Id.* While the medical source opined on the claimant's cognitive abilities, the records cited by the ALJ only spoke to the claimant's emotional health. *Id.* Because it was "not clear how or why that evidence undercut[]" the ALJ's opinion, the Court held that "it was incumbent on the ALJ" to provide an explanation bridging that gap. *Id.*

Unlike the ALJ in *Mason*, the ALJ here cited evidence that "clear[ly]" illuminated her rationale. For example, while Dolecki's alleged disability stemmed from her musculoskeletal and gastrointestinal impairments, the first two records cited by the ALJ show unremarkable abdominal and neurological findings. (ECF No. 10-7, PageID.456, 461). Other records note full strength in Dolecki's lower

32

extremities, normal reflexes, and unremarkable gait, "good" coordination in her legs, and unremarkable neurological findings.  (*Id.* at PageID.516, 521–22).  Again, Dolecki may dispute whether these records could lead a reasonable mind to the same conclusion as the ALJ, but unlike *Mason* there is no mystery surrounding how these citations relate to the ALJ's treatment of Dr. Sheeler's opinion.  Thus, the ALJ's rationale is apparent from her citations alone, and she need not have further explained how she considered this evidence. *See Hardy*, 2021 WL 3702170, at *4.

Accordingly, I suggest that the ALJ adequately articulated how she considered the consistency and supportability of Dr. Sheeler's opinion.

### 2.    Whether the ALJ Relied on Substantial Evidence.

Even if the ALJ properly articulated how she evaluated Dr. Sheeler and Ms. Marshall's opinions, Dolecki argues that the ALJ's choice to discount these opinions was not supported by substantial evidence.  I disagree.

### a.    Dr. Sheeler

Dr. Sheeler opined that Dolecki must alternate between sitting and standing at will, but that in no event could she sit or stand for thirty minutes continuously. (ECF No. 10-7, PageID.882–83).  In her opinion, Dolecki could neither sit nor stand for more than two hours each in an eight-hour workday.  (*Id.* at PageID.883).  Dr. Sheeler also opined that Dolecki could lift up to ten pounds occasionally, but that

33

she could never lift twenty pounds.  (*Id.*)  Finally, Dr. Sheeler opined that Dolecki could never twist, stoop, crouch, climb ladders, or climb stairs.  (*Id.* at PageID.884).[2]

The ALJ agreed with Dr. Sheeler that Dolecki had deficiencies in the areas she identified; however, she disagreed with Dr. Sheeler on the extent to which Dolecki was limited.  As to Dolecki's postural limitations, for example the ALJ believed that Dolecki could "balance, stoop, kneel, crouch, or crawl" for up to one-third of the workday.  (ECF No. 10-2, PageID.76).  She also agreed that Dolecki could never climb ladders but found that Dolecki could spend up to two-thirds of the workday climbing stairs.  (*Id.*)  As to Dolecki's ability to lift, stand, and walk, the ALJ found that she could perform light work, meaning that she could lift no more than twenty pounds at once and that she could also spend up to two-thirds of the workday lifting up to ten pounds.  (*Id.*)  This also meant that Dolecki could stand or walk, "off and on," for up to two-thirds of the workday and sit "intermittently during the remaining time."  SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983); *see also* 20 C.F.R. §§ 404.1567(b), 416.967(b).

In support of these departures from Dr. Sheeler's opinions, the ALJ acknowledged that Dolecki's medical records "occasionally" noted "abnormal

---

[2] Dr. Sheeler also opined that Dolecki would be off task for at least a quarter of each workday and absent more than four times per month due to her impairments.  (*Id.* at PageID.882, 884).  However, Dolecki does not challenge these findings.  (ECF No. 15-1).

findings," but she reasoned that none of these findings justified the extensive limitations proposed by Dr. Sheeler.  (ECF No. 10-2, PageID.78, 80).  Moreover, the ALJ believed the record "consistently" indicated that Dolecki was not as limited as Dr. Sheeler believed.  (*Id.*)  For example, the ALJ noted that Dolecki's lower back and hip pain was largely under control with pain medication, citing her subjective reports to physicians and her failure to seek out "aggressive treatment."  (*Id.* at PageID.78 (citing ECF No. 10-7, PageID.487–89, 645, 866)).  In addition, the ALJ cited an expansive range of medical records indicating that Dolecki's sensation, motor strength, reflexes, range of motion, and gait were typically "normal."  (*Id.*; *see also* ECF No. 10-7, PageID.456, 461, 466, 512–13, 521–22, 525–26, 543, 568, 585, 592, 598–99, 603–04, 609–10, 614, 616–17, 633, 709, 840–41, 850, 868; ECF No. 10-9, PageID.1592, 1601; ECF No. 10-10, PageID.1675, 1678).

Dolecki attempts to erode the basis for the ALJ's findings by attacking the probative value of various records cited by the ALJ in support of her decision.  But taken together, these criticisms fall short of demonstrating that the ALJ's RFC finding was not supported by substantial evidence.

First, Dolecki takes issue with the ALJ's reliance on objective medical findings from appointments unrelated to her "spinal impairment"—the cause behind the functional limitations outlined in Dr. Sheeler's statement.  (ECF No. 15-1, PageID.1718).  For example, Dolecki argues that the ALJ improperly cited findings

from a visits concerning gastrointestinal and podiatric issues because these impairments were not relevant to the functional limitations identified by Dr. Sheeler. (*Id.*)

But this argument demonstrates that Dolecki misunderstands the purpose of the RFC inquiry, and as a result, she fails to appreciate why the ALJ found these records to be relevant. A claimant's RFC describes "what the claimant can do, not what maladies the claimant suffers from . . . ." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002); *see also Yang v. Comm'r of Soc. Sec.*, No. 00-10446, 2004 WL 1765480, at *5 (E.D. Mich. July 14, 2004). Thus, it matters not whether the ALJ cited records from medical appointments unrelated to the *impairments* Dr. Sheeler addressed: what matters is whether these records contain any evidence concerning the *functional abilities* she opined on. *See Howard*, 276 F.3d at 240. And that is exactly what the ALJ cites these records for. Indeed, at Dolecki's medical appointment for her gastrointestinal issues, physicians conducted a physical examination and found that Dolecki displayed a full range of motion in all extremities, normal strength in all muscle groups, good coordination, and a stable gait. (ECF No. 10-7, PageID.568, 610). Likewise, Dolecki's podiatrist noted that Plaintiff displayed "good" coordination, "stable" gait, normal muscle strength, and normal muscle tone." (*Id.* at PageID.521–22). Those findings are relevant to Dr. Sheeler's opinions on Dolecki's ability to walk, stand, lift, and bend.

36

The mere fact that a claimant schedules an appointment to address a specific impairment does not mean that all findings from the appointment inherently relate only to that impairment.  Different impairments may have overlapping symptoms, and the subjective complaints and objective findings may be recorded in a physician's medical notes may cover more than the specific medical issue that prompted the appointment.  Had the ALJ cited these records as evidence of Dolecki's underlying impairments, rather than the functional limitations that resulted from those impairments, then perhaps her citation to these records would not constitute substantial evidence.  *Cf. Perkins v. Comm'r of Soc. Sec.*, No. 10-12838, 2011 U.S. Dist. LEXIS 112359, at *8–9 (E.D. Mich. Sept. 30, 2011).  But again, the ALJ did not cite these appointments to prove anything about Dolecki's gastrointestinal and podiatric impairments, she cited them for their findings regarding her gait, strength, and mobility—all functional abilities on which Dr. Sheeler opined.  *Cf. id.*

Next, Dolecki faults the ALJ for relying in part on evidence that predates the onset of her disability.  (ECF No. 15-1, PageID.1719–20).  She explains that this evidence is stale as her spinal condition deteriorated from her onset in 2018 through 2021.  (*Id.*)  An ALJ may consider evidence predating the claimant's onset of disability alongside evidence from the relevant period, but "only to the extent that it illuminates" the claimant's condition following the onset of his or her disability. *Snyder v. Comm'r of Soc. Sec.*, No. 1:15-cv-137, 2016 WL 944905, at *4 n.3 (W.D.

37

Mich. Mar. 14, 2016); *see also DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 414 (6th Cir. 2006).  The more a claimant's pre-onset condition resembles his or her condition following the onset of disability, the more probative evidence will be.  *See Carmickle v. Comm'r, Soc. Sec.*, 533 F.3d 1155, 1165 (9th Cir. 2008); *DeBoard*, 211 F. App'x at 414; *Hill v. Comm'r of Soc. Sec.*, No. 17-10089, 2018 WL 1404416, at *8 (E.D. Mich. Feb. 27, 2018). Thus, pre-onset evidence about claimants who suffer from chronic conditions that change gradually over time are likely to be more probative than pre-onset evidence about claimants who have suffered acute injuries or rapid changes in their condition.  *Mullen v. Comm'r of Soc. Sec.*, No. 18-13828, 2020 WL 2738247, at *11 (E.D. Mich. Apr. 16, 2020); *see Carmickle*, 533 F.3d at 1165.  There is no hard and fast rule that any deterioration in the claimant's condition makes earlier evidence completely unreliable, and ALJs are required to at least consider evidence predating the onset of disability if it is contained in the claimant's medical record.   42 U.S.C. § 423(d)(5)(B) (2018); 20 C.F.R. §§ 404.1545(a), 416.945(a); *see DeBoard*, 211 F. App'x at 414.

Dolecki fails to establish that her condition drastically changed to such an extent that it was unreasonable for the ALJ to partially rely on her pre-onset medical records.  Plucking a few abnormal findings from her record, Dolecki reasons that the ALJ's reliance on pre-onset evidence was "flawed" because these select records show that her "spinal condition worsened" following the onset of her disability.

(ECF No. 15-1, PageID.1719–20).  But again, there is no strict rule that any change, no matter how mild, in the claimant's condition obviates findings from earlier medical records.  *See Carmickle*, 533 F.3d at 1165.  Rather, the court's inquiry is a fact-specific one, analyzing the exact ways in which the changes to the claimant's medical condition impacted earlier medical findings.

But no such discussion can be found in Dolecki's brief.  True enough, the abnormal findings she identifies may indicate some deterioration of her spine, but to what extent, precisely, did these changes obviate her pre-onset medical findings, and what impact could those changes have had on her functional abilities?  Without answering these questions, it is impossible to evaluate how these findings affected the probative value of her pre-onset records.[3]  As a result, the Court cannot begin to assess whether the ALJ relied on substantial evidence when she weighed the pre-

---

[3] Nor does Dolecki convincingly argue that the ALJ eschewed any consideration of post-onset evidence that conflicted with pre-onset records.  Specifically, Dolecki points out that she was diagnosed with sciatica in August 2018, and she implies that the ALJ ignored this finding by focusing instead on pre-onset records indicating that medical providers "did not document any neurological findings."  (ECF No. 15-1, PageID.1719–20).  But that argument belies the record.  The ALJ never stated that that the record "did not document any neurological findings."  (*Id.*; see also ECF No. 10-2, PageID.80).  She stated only that Dolecki's neurologic examinations were "routinely" (not completely) unremarkable, and earlier in the decision, she even acknowledged that Dolecki "experience[d] symptoms of neurological compromise manifested as lower extremity pain and numbness."  (ECF No. 10-2, PageID.78, 80).  More to the point, the ALJ did not discount this abnormal neurological finding solely based on pre-onset records, she also relied on records that postdated the examination and the onset of Dolecki's disability.  (*See, e.g.*, ECF No. 10-7, PageID.521–22, 568, 604, 610, 614, 841).

onset evidence against the post-onset evidence. Indeed, the ALJ apparently considered the pre-onset evidence in context with evidence from the years following her onset of disability, as half of her citations are to medical records postdating the onset of disability. (ECF No. 17, PageID.1744; *see also* ECF No. 10-2, PageID.66–84). So why did the ALJ inadequately weigh these records? And why could the ALJ have not reasonably viewed these isolated records as mild changes with little impact on her overall condition? Dolecki provides no answers, resigning herself to criticize the ALJ's factfinding at a high level of generality. Accordingly, she demonstrates no error in the ALJ's partial reliance on pre-onset medical evidence.[4]

Separately, Dolecki faults the ALJ for citing an examination conducted over a video call as support for discounting Dr. Sheeler's opinions. While Dolecki correctly identifies the inherent limitations of these "telemedicine" appointments, these limitations do not rob observations from telemedicine appointments of all probative value. *See Gerry v. Comm'r of Soc. Sec.*, No. 5:21-CV- 01115-DAR, 2022 U.S. Dist. LEXIS 175263, at *5 (N.D. Ohio Sept. 27, 2022). And more to the point,

---

[4] Even if the ALJ ignored Dolecki's pre-onset records and focused exclusively on the medical records postdating Dolecki's onset of disability, Dolecki does not explain how this would have changed the ALJ's findings, and the Court cannot remand to correct an error if the ALJ "would have made the same ultimate [conclusion] with the erroneous finding removed from the picture . . . ." *Berryhill v. Shalala*, No. 92-5876, 1993 WL 361792, at *7 (6th Cir. Sept. 16, 1993) (quotation marks omitted) (quoting *Kurzon v. United States Postal Serv.*, 539 F.2d 788, 796 (1st Cir. 1976)); *see also Shinseki v. Sanders*, 556 U.S. 396, 410 (2009).

the ALJ did not rely on these telemedicine visits in isolation: she instead used them to buttress objective findings from in-person appointments.  (*See* ECF No. 10-2, PageID.78, 80).  This argument falls short of proving that the ALJ did not rely on substantial evidence.

Last, Dolecki argues that the ALJ did not rely on substantial evidence in evaluating Dr. Sheeler's opinions because she "ignored" corroborating evidence and considered only the evidence that conflicted with her findings.  (ECF No. 15-1, PageID.1720–21, 1723–24).  Arguments, like this, that an ALJ "cherry picked" evidence are seldom successful because in most circumstances, "the same process can be described more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009).  Unless an ALJ truly ignored the overwhelming weight of authority, crediting an argument that the ALJ "cherry picked" evidence typically requires the District Court to reweigh the evidence. *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014).  But the Court cannot reverse an ALJ's decision just because substantial evidence may have also supported another finding—this Court's review is limited to whether the ALJ's decision was supported by substantial evidence.  *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 440 (6th Cir. 2017).

At most, Dolecki identifies substantial evidence in support of Dr. Sheeler's opinions, but she falls short of establishing that a reasonable mind could not also

reach the ALJ's contrary findings.  The ALJ did not "ignore[]" evidence consistent with Dr. Sheeler's opinion, as Dolecki suggests.  (ECF No. 15-1, PageID.1723).  Indeed, she spends much of her opinion acknowledging that Dolecki sometimes displayed abnormal findings.  (ECF No. 10-2, PageID.77–79).  However, the ALJ reasoned that more often, her objective examinations were unremarkable.  (ECF No. 10-2, PageID.78, 80).  Dolecki frequently displayed a stable gait, full strength, normal reflexes, and a full range of motion—notwithstanding occasional findings otherwise.  (ECF No. 10-7, PageID.521-22, 525, 543, 568, 585, 592, 598-99, 603-04, 609-10, 614, 616-17, 709, 840-41, 868; ECF No. 10-9, PageID.1592, 1601).  Weighing these conflicting records, the ALJ found a highly restrictive RFC.  (ECF No. 10-2, PageID.76–77).

Moreover, Dolecki does not explain why the abnormal evidence she cites is "consistent" with the extreme limitations suggested by Dr. Sheeler.  (ECF No. 15-2, PageID.1721 (emphasis removed)).  For instance, Dolecki asserts that Dr. Sheeler's opinions are consistent with an examination where she displayed "4/5 strength in the lower extremities, tenderness to palpitation in the lumbar region paraspinally, spasm in the lumbar paraspinal muscles, and positive straight leg test bilaterally."  (*Id.*)  But she never explains why these findings support Dr. Sheeler's opinion *and* foreclose the ALJ's RFC.  (*Id.*)  Why was it reasonable, for example, to find that these conditions prevented Dolecki from crouching, but unreasonable to find that they

only prevented Dolecki from crouching for more than one-third of the workday? (*Compare* ECF No. 10-2, PageID.76–77, *with* ECF No. 10-7, PageID.884). The same records can serve as substantial evidence of different findings. *Cutlip*, 25 F.3d at 286. Yet Dolecki presents no logical bridge to explain why the ALJ could not have viewed even these abnormal findings as inconsistent with Dr. Sheeler's extreme limitations. *See id.* Accordingly, these findings do not show any flaw with the ALJ's treatment of Dr. Sheeler's opinion, even if they could also have served as substantial evidence in support of her opinions.

### b.   Ms. Marshall

The ALJ also relied on substantial evidence in discounting Ms. Marshall's opinions. Ms. Marshall wrote a medical source statement in which she opined that Dolecki's major depressive disorder and PTSD would cause her to miss more than four days of work per year and to be off task for more than a quarter of the workday. (ECF No. 10-7, PageID.975–76, 978). She also opined that Dolecki could not satisfactorily make even "simple work-related decisions," perform work "at a consistent pace without an unreasonable number and length of rest periods," or "deal with normal stress." (*Id.* at PageID.977).

The ALJ also believed that Dolecki's depression constrained her functional abilities to a substantial degree. However, she did not believe that the record fully supported the degree of limitations described by Ms. Marshall. Unlike Ms. Marshall,

43

the ALJ found that Dolecki could perform "simple and routine work" requiring her to make "simple" decisions. (ECF No. 10-2, PageID.76–77). She also found that Dolecki could not work "on an assembly line or conveyor belt," and that she could only tolerate occasional interaction with public and occasional changes to her work-environment. (*Id.* at PageID.77). Further, the ALJ disagreed that Dolecki would be off-task for over one-quarter of the workday, and she declined to adopt Ms. Marshall's opinion that Dolecki would be absent four days per month on average. (*Id.*)

The ALJ recognized that Dolecki's history of depression is well-documented throughout her medical record. (ECF No. 10-2, PageID.74–76, 79). Indeed, as Dolecki points out, her treatment records with the Judson Center consistently note that she presented in a depressed mood with a limited attention span. (ECF No. 10-7, PageID.745–804, 979–1005; ECF No. 10-10, PageID.1619–1671).

Yet the ALJ did not find that these notes warranted the full extent of limitations suggested by Ms. Marshall. According to the ALJ, Dolecki's treatment records from the Judson Center provided few "details" about her "treatment, limitations, and issues." (ECF No. 10-2, PageID.79). For example, the "[s]ummary pages" in these records were "often blank or sparse." (*Id.*; *e.g.*, ECF No. 10-10, PageID.1644, 1650, 1656, 1664). Likewise, the summaries of Dolecki's subjective complaints conveyed little detail, and the Judson Center's objective findings

44

generally either consisted of checked boxes.  (ECF No. 10-7, PageID.745–804, 979–1005; ECF No. 10-10, PageID.1619–1671).  Moreover, nothing in these notes spoke directly to Dolecki's ability to perform simple tasks, attend work on a regular basis, or remained focused on a task for an adequate portion of a workday.  (*Id.*)  At bottom, the treatment records from the Judson Center did not provide enough information for the ALJ to evaluate whether extreme limitations in Ms. Marshall's statement were well-founded.

Moreover, other evidence in the record indicated that Dolecki's depression was not so severe that she would be absent from work unacceptably often or that she could not perform, and focus on, even simple tasks.  Indeed, the record contains no evidence that Dolecki ever required inpatient care or displayed any intent to harm herself.  (ECF Nos. 10-7, 10-10).  Her care apparently consisted of counseling and medication, and as the ALJ noted, recent medical records noted that her mood began to stabilize after her providers added Latuda to her medication regimen in 2020.  (ECF No. 10-2, PageID.79, 81; *see also* ECF No. 10-7, PageID.1003; ECF No. 10-10, PageID.1659, 1667).  In addition, Dolecki often presented to medical providers, both at the Judson Center and elsewhere, as calm, attentive, focused, well-groomed, and friendly.  (ECF No. 10-2, PageID.75, 79).

The ALJ also cited nonmedical evidence that she believed was inconsistent with an inability to remain sufficiently focused on simple tasks or attend work on a

consistent basis.  For instance, she noted that several records indicated that Dolecki was her mother's primary caregiver.  (ECF No.10-7, PageID.641, 839, 987; ECF No. 10-10, PageID.1633).  Dolecki and her brother also completed forms describing her "activities of daily living."  In these forms, they indicated that Dolecki performed simple tasks that required some concentration.  For example, she would read, sew, journal, and manage her finances.  (ECF No. 10-6, PageID.368, 37–71, 386, 389). These forms also indicated that while Dolecki did not socialize often, she got along well with "family, friends, neighbors, and authority figures," and would call or text others every day.  (*Id.* at PageID.371–73, 389–91; *see also* ECF No. 10-2, PageID.75).  Moreover, while Dolecki asserted that she had issues performing self-care and handling personal responsibilities, she generally attributed these issues to her physical, rather than mental, impairments.  (ECF No. 10-2, PageID.75; *see, e.g.*, ECF No. 10-6, PageID.386).  She also performed other activities that the ALJ felt were inconsistent with Ms. Marshall's extreme limitations, such as utilizing public transportation on her own and attending medical appointments independently.  (ECF No. 10-2, PageID.79–80).

To summarize the only records corroborating Ms. Marshall's opinions were vague and did not speak directly to the limitations she found, meanwhile other evidence in the record indicated that Dolecki's depression was not as limiting as Ms. Marshall described.  But still, the ALJ imposed a highly restrictive RFC to account

for Dolecki's mental illness.  Although the record may have also supported different RFC findings, including those proposed by Ms. Marshall, it also supported the ALJ's findings.  *See Cutlip*, 25 F.3d at 286.  Accordingly, I suggest that the ALJ relied on substantial evidence in discounting Ms. Marshall's opinions.

### H.    Conclusion

For these reasons, I conclude that substantial evidence supports the ALJ's decision.  Consequently, I recommend **DENYING** Plaintiff's Motion, (ECF No. 15), **GRANTING** the Commissioner's Motion (ECF No. 17), and affirming the decision.

### III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and

Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  June 6, 2023             S/PATRICIA T. MORRIS
                                Patricia T. Morris
                                United States Magistrate Judge

48